**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
UNITED STATES OF AMERICA,

     Petitioner,

         v.                                   MEMORANDUM
                                              AND ORDER

JEFFRY ALEJANDRO PENA-BENCOSME,              05-M-1518 (SMG)

     Defendant.

-----------------------------------------------------X

**Gold, S., U.S.M.J.:**

## <u>Introduction</u>

Petitioner, United States of America, acting on behalf of the government of the

Dominican Republic, has requested the extradition to the Dominican Republic of Jeffry

Alejandro Pena-Bencosme, a citizen of the United States, ("Pena-Bencosme" or "defendant").

This request is made pursuant to 18 U.S.C. § 3184 and the Extradition Treaty Between the

United States and the Dominican Republic (the "Treaty") of June 19, 1909. *See* Complaint and

Affidavit in Support of Application for an Arrest Warrant ("Compl.") Ex. A, Docket Entry 1.

Pena-Bencosme is wanted in the Dominican Republic on homicide charges for the shooting death

of a police officer, Santiago Fortuna Sanchez.[1]  Defendant opposes extradition, arguing a lack of

probable cause to find that he committed the crime, and in particular contending that his actions

---

[1] In addition to the voluntary homicide charge, the Dominican Republic also charged
Pena-Bencosme with carrying an unlicensed firearm.  Compl. ¶ 4.  At the hearing held on
September 14, 2006, the government stated that it was proceeding only with respect to the
homicide charge.  Transcript of Extradition Hearing held on September 14, 2006 ("Tr.") 4.
Under the "doctrine of specialty" and pursuant to Article IV of the Treaty, the Dominican
Republic may no longer prosecute Pena-Bencosme on the firearm charge.  *See* Compl. Ex. A,
Art. IV ("No persons shall be tried for any crime or offence other than that for which he was
surrendered.").  Moreover, it appears that the Treaty does not provide for extradition on firearms
charges.  *Id*. at Art. II.

were taken in self-defense. Defendant argues in the alternative against extradition on the ground that he fears for his safety if returned to the Dominican Republic. Defendant's Memorandum in Opposition to the Government's Request for Extradition to the Dominican Republic ("Def. Mem."), Docket Entry 10.

The Treaty provides for extradition upon a showing that the requested individual has been charged with or convicted of one of several enumerated extraditable offenses, including murder and voluntary manslaughter, and that the court finds probable cause to support the charge. Compl. Ex. A, Arts. I, II. The defense raises no arguments concerning any technical defects related to the extradition request. *See* Def. Mem. The only issues to be decided, then, are whether the government of the Dominican Republic has presented sufficient evidence for a finding of probable cause, and whether defendant's concerns for his safety in the Dominican Republic are cognizable before this Court.

I held a hearing to consider whether the evidence presented by the Government of the Dominican Republic is sufficient to support extradition on September 14, 2006. For the reasons stated below, I conclude that the government's evidence establishes probable cause and that extradition is warranted.

## Discussion

### I. Procedural History

Defendant Pena-Bencosme was arrested pursuant to a warrant issued on December 7, 2005 and first appeared before the court on February 7, 2006. Docket Entries 2, 3. During a status conference held on March 1, 2006, Pena-Bencosme declined to waive extradition and sought a hearing, which was set for April 4, 2006. Subsequently, the defendant requested

additional time and the hearing was adjourned to May 9, 2006.  By letter dated May 4, 2006, Pena-Bencosme requested another adjournment to arrange for witnesses to come from the Dominican Republic to testify on his behalf at the hearing.  I granted defendant's application and adjourned the hearing to June 21, 2006.

At the June 21, 2006 court appearance, Pena-Bencosme requested an additional three months to secure his witnesses.  During this conference, I expressed concern over the length of time Pena-Bencosme was being held in custody and emphasized the limited scope of the evidence properly considered at an extradition hearing.  Transcript of Status Conference of June 21, 2006 ("Status. Conf. Tr.") 3-6, Docket Entry 13.  The defendant responded that he intended to present "a wide-ranging grouping" of witnesses, including those whose statements had been submitted by the government, "who would clarify their statements, explain why they're completely distorted," and pressed his request for a lengthy adjournment.  *Id*. at 7.

At the status conference on June 21, 2006, I also highlighted my concerns about the government's failure to produce underlying documents referred to in its submission.  In particular, I noted that the government's evidence refers to a confession by the defendant but that the actual confession was not provided.  *Id*. at 11.  *See also* Government Exhibit ("Gov't Ex.") A at 10.[2]  Second, I noted that there was no information regarding the victim's weapon, and in particular, as some witnesses had reported, whether the magazine had been taken out of the gun, whether there was a bullet in the chamber, whether the gun had been fired, or where the gun was

_____

[2] Government Exhibits A, B, and C were entered into evidence at the extradition hearing on September 14, 2006.  The Exhibits are English translations of the certified documents produced by the Dominican Republic in support of extradition.  Government Exhibits A and B were produced as part of the government's original submission, and Exhibit C was produced some time after the status conference.

recovered.  Status Conf. Tr. at 11.  Lastly, I noted the absence of statements by the defendant's friends who were with him at the time of the incident.  *Id*.

The extradition hearing was held on September 14, 2006.  The government introduced the certified documents submitted by the Dominican Republic in support of its request for extradition as Exhibits A, B, and C.  Despite the extensive adjournments requested by Pena-Bencosme and the anticipated "wide-ranging grouping" of witnesses, the defendant's case included only the testimony of two individuals and some documents.  After the hearing, the defendant submitted additional documents.  Defendant's Exhibits ("Def. Ex."), submitted by cover letter dated Sept. 29, 2006, Docket Entry 17 (Exhibits in hard copy only).  Finally, on October 6, 2006, both sides presented their closing arguments in writing.  Docket Entries 18, 19.

## II.    Scope of Extradition Hearing

The scope of an extradition hearing is narrow and rests within the sound discretion of the presiding judge, who must ensure that the hearing is not converted into a "dress rehearsal trial." *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).  *See also Charlton v. Kelly*, 229 U.S. 447, 461, 33 S. Ct. 945, 949 (1913).  The limited purpose of an extradition hearing is to determine whether the requesting country has presented sufficient evidence to warrant a finding of probable cause to believe that the requested individual has committed the offense charged. *See Charlton*, 229 U.S. at 449, 33 S. Ct. at 946-47.  "An extradition hearing is not the occasion for an adjudication of guilt or innocence."  *Melia v. U.S.*, 667 F.2d 300, 302 (2d Cir. 1981).

The rules of evidence that apply at trial are not applicable in extradition proceedings. Hearsay statements of witnesses summarized in the affidavit of a foreign official are admissible

and may be sufficient to warrant a finding of probable cause.[3]  *See Simmons v. Braun*, 627 F.2d

635, 636 (2d Cir. 1980); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162 (11th Cir. 2005) (affirming

probable cause finding based on unsworn indictment summarizing witness statements); *Bovio v.*

*U.S.*, 989 F.2d 255, 259-61 (7th Cir. 1993) (affirming probable cause finding based on

investigator's affidavit); *Emami v. U.S. Dist. Ct. for the Northern Dist. of Cal.*, 834 F.2d 1444,

1448 (9th Cir. 1987) (affirming probable cause finding to extradite for insurance fraud based on

prosecutor's sworn affidavit); *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y. 1973) ("A

determination of probable cause in an extradition proceeding may rest entirely upon hearsay.")

(citation omitted).  Indeed, the Supreme Court has recognized that a court may order extradition

based upon "unsworn statements of absent witnesses."  *Collins v. Loisel*, 259 U.S. 309, 317, 42

S. Ct. 469, 472 (1922).  Nonetheless, a court must conduct an independent assessment of the

evidence and closely examine the requesting country's submissions to ensure that any hearsay

bears sufficient indicia of reliability to establish probable cause.  *Gill v. Imundi*, 747 F. Supp.

1028, 1041 (S.D.N.Y. 1990) (recognizing that an extradition court has the "authority and

discretion to go beyond the face of the government's affidavits for purposes of determining

credibility or reliability").  *See also In re Extradition of Singh*, 170 F. Supp. 2d 982, 1023 (E.D.

Cal. 2001) ("[T]he extradition judge makes credibility determinations as to the competence of the

evidence supporting probable cause."); *U.S. v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 n.7

(S.D. Fla. 1999) ("Where a request for extradition is supported by an affidavit, recital of

sufficient underlying facts is necessary if a magistrate judge is going to perform his judicial

---

[3] The federal statute governing extradition proceedings requires that documents be properly authenticated in order to be admissible in an extradition hearing.  18 U.S.C. § 3190. The documents here have been properly certified.  *See* Compl. ¶ 5.

functions and not act merely as a rubber stamp.") (citation omitted).

A defendant's right to proffer evidence opposing extradition is extremely limited.

Generally, an accused confronting extradition

> has no right to introduce evidence which merely contradicts the
> demanding country's proof, or which only poses conflicts of
> credibility. On the other hand, the accused has the right to
> introduce evidence which is 'explanatory' of the demanding
> country's proof.

*Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978).[4] Admissible, explanatory

evidence is limited to "reasonably clear-cut proof . . . of limited scope" with a "reasonable

chance" of obliterating or negating the government's probable cause showing. *Id*. at 685. In

contrast, evidence of an affirmative defense to the crime, such as the defense of justification, is

considered contradictory evidence and is beyond the scope of an extradition hearing. *See*

*Charlton*, 229 U.S. at 462, 33 S. Ct. at 950 (affirming exclusion of evidence of insanity defense);

*Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir. 1973) ("[E]vidence of . . . facts contradicting

the demanding country's proof *or of a defense* . . . may be properly excluded. . . .") (emphasis

added); *In re Extradition of Ramos Herrera*, 268 F. Supp. 2d 688, 697 (W.D. Tex. 2003)

(refusing to consider defendant's testimony concerning an affirmative defense to a shooting);

*In re Extradition of Powell*, 4 F. Supp. 2d 945, 958-60 (S.D. Cal. 1998) (denying defendant's

request to present evidence of a duress defense); *In re Ezeta*, 62 F. 972, 986 (N.D. Cal. 1894)

("[The defendant's] justification – that he was merely acting in obedience to the orders of his

_____

[4] The distinction between evidence that merely "contradicts" the requesting country's
proof and evidence which "explains" that proof is not a particularly clear one. *See*, *e.g.*, *In re
Extradition of Strunk*, 293 F. Supp. 2d 1117, 1122 (E.D. Cal. 2003) (describing the distinction as
"metaphysical").

superior officers . . . – cannot here be considered. What that defense would amount to upon the trial of the case in Salvador cannot now be determined. . . . The fact that he fired the shots in defense of himself. . . is obviously a matter of defense to be presented [at a trial in the foreign country] . . ., where all the witnesses of the affair may be secured.").

III.    **Facts**

The parties agree that, at approximately midnight on October 24, 2004, Pena-Bencosme and his friends arrived at the Daiqui Loco, a bar in Santiago, Dominican Republic.[5] Pena-Bencosme got out of his car and urinated in the street. Fortuna Sanchez and his wife had arrived at the Daiqui Loco a short while earlier. Fortuna Sanchez, who was not in uniform or on duty, was angered by Pena-Bencosme's conduct and verbally confronted him. Bystanders intervened and restrained Fortuna Sanchez. Pena-Bencosme returned to his vehicle. Moments later, Fortuna Sanchez approached the open driver's side window where Pena-Bencosme sat and the heated verbal exchange between the two men continued and escalated.

The events that occurred next are in dispute. The government alleges that Pena-Bencosme yelled obscenities at Fortuna Sanchez and that he then shot Fortuna Sanchez without provocation. After Fortuna Sanchez fell to the ground, Pena-Bencosme attempted to flee in his vehicle, but an off-duty police officer fired his weapon at the defendant, wounding him. The vehicle then crashed and Pena-Bencosme was arrested. Pena-Bencosme concedes that he fired his weapon and shot Fortuna Sanchez. The defendant, however, alleges that Fortuna Sanchez was the aggressor, and that Fortuna Sanchez threatened Pena-Bencosme with a loaded gun.

_____

[5] Documents refer to the events occurring either on October 24, 2004 or October 25, 2004.

Pena-Bencosme argues that he retreated to his vehicle but that Fortuna Sanchez, who was drunk, slapped him and then shot him. Pena-Bencosme contends that he then reached for his gun and fired, but only in self-defense, having just been shot by Fortuna Sanchez.

## IV.     Probable Cause

### A.     The Homicide Charge Against Pena-Bencosme

The Dominican government indicted Pena-Bencosme on a charge of voluntary homicide under Article 295 of the Dominican Penal Code. Article 295 states that "[h]e who voluntarily kills another person is guilty of homicide." Gov't Ex. A at 6. In her affidavit submitted in support of extradition, the Dominican prosecutor states that there are two material elements to this crime: a) "[the] pre-existence of a destroyed human life" and b) "a voluntary action of the person who causes a death." *Id*. The prosecutor does not define what legally constitutes a "voluntary action" but alleges that these elements are met in Pena-Bencosme's case. *Id*. The prosecutor further states that the government must also prove a moral element – i.e., "[t]his is a case of specific offense called intent to kill, or *animus necandi*." *Id*. Again, there is no explanation of what level of intent is necessary, but the prosecutor alleges that this element has been "sufficiently proven, since a shot was fired with the intent to cause the death" of Fortuna Sanchez. *Id*. Further, the prosecutor contends that "[t]his is demonstrated by the distance from where the shot was fired and the part of the body at which it was aimed." *Id*.

As discussed below, I conclude that the government's proof meets the limited threshold of probable cause and is sufficient to support extradition. Moreover, extradition would be warranted even if Pena-Bencosme had persuasively countered the government's proof and established that he was acting in self-defense. This is so for two reasons.

First, it appears that, under the law of the Dominican Republic, self-defense (an "excusable homicide" in the Dominican Republic) is not a complete defense to a homicide. Defendant argues that Dominican law "permit[s]" self-defense. Supplemental Closing Argument on Behalf of Jeffry Alejandro Pena Bencosme ("Def. Supp. Mem.") p. 2, Docket Entry 19. This Court's reading of the pertinent Dominican statutes, though, is that a showing of self-defense is not a basis for acquittal, but rather a basis for a sentence reduction. *See* Def. Ex. 4 (English translations of Articles 321 and 326 of the Dominican Penal Code). Article 321 of the Dominican Penal Code provides that a homicide is excusable if the victim provoked the attack. Article 326, however, provides that "[w]hen the circumstance of excuses is proven, the penalty will be reduced. . . ." Thus, Pena-Bencosme's defense of an excusable homicide does not obliterate probable cause to charge him with the homicide of Fortuna Sanchez.

Second, the Dominican statute's phrase "[w]hen the circumstances of excuse are proven" suggests that self-defense, or provocation by the victim, is an affirmative defense and the burden of proof is on the defendant. As noted above, evidence of an affirmative defense is not properly considered in an extradition proceeding.

B.    *Evidence Presented by the Government*

To establish probable cause, the government relies primarily on an Affidavit made by Yeni Berenice Reynoso Gomez, an Assistant District Attorney in Santiago, Dominican Republic ("Affidavit"), and a limited number of supporting documents. Gov't Exs. A, B.[6] In her Affidavit, Reynoso Gomez summarizes the statements of four eyewitnesses, saying they "saw

---

[6] The content of the affidavit in Exhibit A, signed by the Dominican prosecutor on July 8, 2005, is identical to the content of the affidavit in Exhibit B, signed on April 18, 2005.

when [] Pena-Bencosme shot [] Fortuna Sanchez." Gov't Ex. A at 16. Although the prosecutor's affidavit provided little more than this conclusory summary, the government later supplemented its showing by submitting Exhibit C, a Report on the Case ("Case Report").

According to the Case Report, each of the four witnesses referred to in the prosecutor's affidavit provided a detailed "statement."[7] Desiderio de Jesus Medina Santos, the owner of the Daiqui Loco and a friend of the victim, states that Fortuna Sanchez and his wife arrived at the Daiqui Loco just as he was closing the bar. Shortly thereafter, a red SUV driven by Pena-Bencosme pulled up. Pena-Bencosme got out of the car and began to urinate in the street. When Fortuna Sanchez told him not to urinate there, Pena-Bencosme responded with an insulting racial remark. Fortuna Sanchez then drew his pistol. At that point, Medina Santos and his security guards intervened and persuaded Fortuna Sanchez to put his pistol in one holster and its magazine in another. Pena-Bencosme then went back to his car, but the argument between Fortuna Sanchez and Pena-Bencosme continued. Although Medina Santos never explicitly states that Fortuna Sanchez identified himself as a police officer, he does state that Pena-Bencosme referred to Fortuna Sanchez as a "cop." Medina Santos then says that he "saw a skirmish, [he] heard a gun shot, then [he] saw [the defendant] speed away trying to escape. . . ." Gov't Ex. C at 3.

In her statement, Reyna Maria Rosario, the victim's wife, states that her husband and Pena-Bencosme "started to argue" when Fortuna Sanchez told Pena-Bencosme not to urinate in

---

[7] The Case Report uses quotation marks around the text of the statements but does not indicate whether the statements purport to be verbatim accounts of what the witnesses said or summaries, and does not identify whether the individuals made these statements orally to Reynoso Gomez or another law enforcement officer or whether they were written by the witnesses themselves.

the street, and that the defendant then went to his car. *Id.* at 4. Then, "he shot my husband with a small pistol and my husband fell in my arms. . . . [The defendant] killed my husband because he did not have his service weapon in his hands." *Id.*

Julio Rodriguez Urena, the off-duty officer who shot Pena-Bencosme, similarly describes Pena-Bencosme's arrival and how he urinated in the street. According to Rodriguez Urena, Fortuna Sanchez identified himself as a police officer when he first approached Pena-Bencosme. When Pena-Bencosme got into his car, he cursed at Fortuna Sanchez. Fortuna Sanchez responded by approaching the car with his pistol and magazine in separate holsters. *Id.* "At that moment [Pena-Bencosme] took out his pistol and fired the shot that caused the death of [the victim. Pena-Bencosme then] started his vehicle and tried to get away, but I prevented this by firing a shot at his vehicle which caused [him] to crash into . . . another vehicle."

Lastly, Josue Rumaldo Matera, a security guard at the Daiqui Loco, states that, when Fortuna Sanchez first approached Pena-Bencosme, he identified himself as a police officer and showed Pena-Bencosme his badge. When Pena-Bencosme continued to curse at Fortuna Sanchez, Fortuna Sanchez "approached [Pena-Bencosme] and asked him to stop insulting him and leave, but [Pena-Bencosme] with his firearm fired a shot at [Fortuna Sanchez]." *Id.* At the time, Fortuna Sanchez had his magazine in one holster and his pistol in another.

The Dominican government also provided certain documents to support its probable cause showing. *See* Gov't Ex. B. A majority of the documents, however, concern Pena-Bencosme's escape from the Dominican Republic and most are only tangentially relevant to the homicide charge. *See*, *e.g.*, Gov't Ex. B at 18-19 (civil complaint filed by victim's mother with no firsthand knowledge of the events that led to his death); 15-16, 21-35 (documents related to

"restrictive measures" placed on defendant while in the Dominican Republic); 68-74 (police service records of Fortuna Sanchez and Rodriguez Urena). Some of the documents are of greater significance, though, including two ballistics reports and medical reports reflecting Fortuna Sanchez's autopsy and an examination of Pena-Bencosme's wound. One ballistics report concludes that the bullet recovered from Pena-Bencosme's body was fired from a particular 38 caliber revolver, Gov't Ex. B at 80, and the prosecutor's affidavit identifies that revolver as being the one used by Rodriguez Urena. Gov't Ex. B at 10. Additionally, the Dominican prosecutor provided "Forensic Analysis Certificate 1964-2004," a ballistics report purportedly offered to show that the bullet recovered from Fortuna Sanchez matches Pena-Bencosme's weapon.[8] The report, however, is somewhat ambiguous. First, it describes two different bullets, but the autopsy report identifies only one bullet recovered from the body of Fortuna Sanchez. *Compare* Gov't Ex. B at 78 ("One (1) full metal jacket bullet, with six (6) striations on the right, and one (1) fragmented full metal jacket bullet, with five (5) striations on the right, removed from the dead body of Sergeant Major Santiago Sevastion [sic] Fortuna Sanchez. . . .") *with* Gov't Ex. B at 66 (victim's autopsy report). It is not clear whether both of the bullets were recovered from the victim and, if not, where the other bullet was found. The first bullet is "compatible" with defendant's gun; the second bullet "correspond[s]" to guns of different caliber than the defendant's weapon.[9]

---

[8] In the Dominican Indictment, Government Exhibit B at 37-50, Reynoso Gomez cites "Official Document No. 1590" as a report that "prove[s] that the bullet removed from. . . FORTUNA SANCHEZ was fired by the defendant. . . ." Gov't Ex. B at 44. This document was not provided to the Court as part of the extradition request.

[9] I also note that there is a typographical error in this ballistics report. The report identifies Pena-Bencosme's weapon as a "Caliber 35 Browning pistol," but the Affidavit and

C.       *Evidence Presented by Pena-Bencosme*

Pena-Bencosme argues that the submission by the Dominican Republic fails to establish

probable cause, and in fact constitutes a fraud on the Court because it "tailor[s]" the witnesses'

statements, deliberately omitting certain material facts and misstating others.[10]  Def. Supp. Mem.

pp. 3-5.  *See also* Def. Mem. pp. 9-13.  Pena-Bencosme further argues that the evidence he

presented negates any probable cause showing and establishes that his actions were in self-

defense.  Def. Supp. Mem. pp. 1-2.

At the hearing, Pena-Bencosme presented the testimony of Jennifer Karina Perez-

Gonzalez, a friend who was with him on the night of the shooting.  Tr. 29-53.  On direct

examination, Perez-Gonzalez testified that Fortuna Sanchez was holding a weapon during his

argument with the defendant.  Tr. 38.  Perez-Gonzalez saw Fortuna Sanchez slap Pena-Bencosme

and then heard a shot.  Tr. 41.  According to Perez-Gonzalez, it was Fortuna Sanchez, and not

Pena-Bencosme, who fired the first shot.  *Id*.  Perez-Gonzalez then heard more shots, and saw

Pena-Bencosme's SUV drive away and quickly crash.  Tr. 42.  Perez-Gonzalez's testimony,

however, was completely unreliable.  Perez-Gonzalez conceded she did not *see* Fortuna Sanchez

fire his weapon, but claimed she was able to determine from the sound of the gun shot that it was

fired by Fortuna Sanchez and not Pena-Bencosme.  Tr. 46.  Because Fortuna Sanchez was

---

other evidence identifies the defendant's weapon as a 25 caliber pistol.

[10] Defendant relies on the recent extradition case of *In re Shlomo Ben-Tov*, No. 05-22201 (S.D. Fla. Feb. 22, 2006), in which the magistrate judge vacated his original certification for extradition after finding that there could be "no confidence in the reliability of the submissions of the Dominican Republic" based on defendant's new evidence.  This court will not entertain an inference of fraud by the Dominican prosecutor in this case based upon the findings of another court with respect to a different prosecutor from the Dominican Republic in a different case.

standing right next to Pena-Bencosme, it does not seem possible that Perez-Gonzalez could

identify which one fired his weapon simply from the sound made by the gun. Moreover, on

cross-examination, Perez-Gonzalez contradicted herself within a span of a few minutes with

respect to whether she saw Pena-Bencosme with a gun. Tr. 51-53.

At the hearing, Pena-Bencosme called only one other witness – Jesus del Carmen Mendez

Sanchez. Mendez Sanchez represented Pena-Bencosme in the proceedings against him in the

Dominican Republic. Tr. 10. Mendez Sanchez did not testify about the events leading up to

Fortuna Sanchez's death, but he authenticated certain documents he received as counsel to Pena-

Bencosme, including a copy (and a translation) of the case summary of the Dominican police

investigation and a translated copy of a transcript of Pena-Bencosme's questioning by law

enforcement officers in the Dominican Republic. Def. Exs. 1, 2.

In his post-hearing submission, the defendant presented affidavits from five eyewitnesses.

Def. Exs. 9-13. In sum, these eyewitnesses support his contention either that Fortuna Sanchez

shot first or that Fortuna Sanchez was the aggressor and threatened the defendant with a loaded

gun, justifying Pena-Bencosme's actions. *Id*. In particular, the defendant presented the affidavits

of Desiderio de Jesus Medina Santos, the bar owner, and Julio Rodriguez Urena, the officer who

shot Pena-Bencosme – two witnesses whose statements were presented by the Dominican

prosecution.[11] In their statements to Pena-Bencosme's attorneys, each provides a more

exculpatory version of the pertinent events. Medina Santos states that "[t]here are a number of

---

[11] Unlike the government's submissions, these statements are signed and sworn to by the
eyewitnesses themselves. Moreover, Medina Santos, a friend of the *victim*, and Rodriguez
Urena, a police officer, are less likely to be biased in favor of or have a motive to assist the
defendant.

omissions and distortions [in the summary of his statement submitted by the Dominican Republic] that might mislead the reader." Def. Ex. 9, ¶ 2. First, he says that he has consistently told the Dominican investigators that Fortuna Sanchez was "clearly intoxicated." *Id*. at ¶ 3. Moreover, he states that Fortuna Sanchez "racked" his gun, placing a bullet in the chamber so that it could be fired even after the magazine was removed. *Id*. at ¶ 6. He denies ever hearing Pena-Bencosme utter the obscenities described in the government's submissions. *Id*. at ¶ 8. Finally, Medina Santos asserts that he "revealed all of the above details to Dominican authorities, but they are not reflected in my statements" and that "anybody in Pena's position. . . would be in fear of their life. . . [and i]n the same circumstances, I would have defended myself forcibly." *Id*.

Similarly, Julio Rodriguez Urena states that

> the Sergeant broke free from the friends that were holding him and ran towards the window of the vehicle with the cocked gun (in other words racked) that once the Sergeant . . . approached the door of [Pena-Bencosme's] jeep, various shots were heard, and *[I] was able to observe when [Fortuna Sanchez] fired his weapon*. . . .

Def. Ex. 10 (emphasis added). Rodriguez Urena further states that Fortuna Sanchez was drunk and that Pena-Bencosme, in his opinion, was acting in self-defense. *Id*. Finally, Pena-Bencosme has submitted statements from the friends who accompanied him to the Daiqui Loco on the night of the shooting. Def. Exs. 11-13. These friends state, in substance, that Fortuna Sanchez shot first and Pena-Bencosme shot back only to defend himself. All of the defendant's evidence, however, consistently demonstrates that there is no question that Pena-Bencosme fired his weapon and shot Fortuna Sanchez.

D.      *Analysis*

To support an extradition request, the prosecution need only meet the relatively modest

15

burden of demonstrating probable cause. In determining whether there is probable cause, a court must consider the "totality-of-the-circumstances." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983). In extradition proceedings, probable cause has been defined as "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Extradition of Atta*, 1988 WL 66866, at *4 (E.D.N.Y. June 17, 1988) (citation omitted).

Where the government relies on an affidavit containing hearsay to establish probable cause, a court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that the defendant has committed the crime charged. *Gates*, 462 U.S. at 238, 103 S. Ct. at 2332. Courts have denied extradition where the requesting country's submissions were merely conclusory, unsupported by underlying documentation, or otherwise unreliable. *See*, *e.g.*, *Bovio*, 989 F.2d at 260-61 (explaining that the court originally concluded that the evidence was insufficient to support extradition but permitted the government to supplement its showing and then, on reconsideration, found probable cause); *In re Ribaudo*, 2004 WL 213021, at *5-7 (S.D.N.Y. Feb. 3, 2004); *Strunk*, 293 F. Supp. 2d at 1139-40 (noting that "[w]hile the Philippines is not required to submit all their evidence against the extraditee with a request for extradition, the lack of probable cause connecting Strunk to the crime is highlighted by the fact that corroborating evidence which could have bolstered the case is missing."); *In re Extradition of Platko*, 213 F. Supp. 2d 1229, 1237-41 (S.D. Cal. 2002); *Fernandez Morris*, 99 F. Supp. 2d at 1368-69; *In re Extradition of Ernst*, 1998 WL 395267, at *9-10 (S.D.N.Y. July 14, 1998); *In re Extradition of*

*Lehming*, 951 F. Supp. 505, 517 (D. Del. 1996). Although the Dominican Republic is not required to produce all of its evidence against the defendant at the extradition hearing, *see Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993), it must provide proof, with sufficient indicia of reliability, to establish probable cause to believe that Pena-Bencosme committed the crime charged. *See Afanasjev*, 418 F.3d at 1162 (foreign government submitted one hundred six page indictment that, although unsworn and comprised largely of hearsay, provided a "*detailed* account of [defendants'] alleged criminal activities . . . [and] summarized statements made by victims, employees . . ., and other witnesses") (emphasis added); *Emami*, 834 F.2d at 1447 (foreign prosecutor's sworn affidavit included "fifty-two pages of *detailed* summaries of statements made by former employees and patients") (emphasis added); *Sacirbey v. Guccione*, 2006 WL 2585561 (S.D.N.Y. Sept. 7, 2006) (German government provided sworn affidavits of three individuals with firsthand knowledge of the defendant's alleged criminal activities); *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 893 (N.D. Ill. 2006) (Mexican government provided sworn statements from all four eyewitnesses); *In re Extradition of Waters*, 2003 WL 23185666, at *4 (E.D.N.Y. Nov. 24, 2003) (foreign government's proffer included sworn statements from the victims and a law enforcement memorandum with a detailed statement by a co-defendant); *Orellana v. Parks*, 2003 WL 1960268, at *4 (S.D.N.Y. Mar. 25, 2003) (foreign government provided the defendant's videotaped and written confessions); *In re Extradition of Pineda Lara*, 1998 WL 67656, at *9 (S.D.N.Y. Feb. 18, 1998) (foreign government provided detailed testimony of five individuals, a recorded conversation, and various documents that offered direct evidence to support its probable cause showing).

In support of extradition, the government has submitted a detailed account of the

statements made by each of the four witnesses, ballistics test results, and pathology reports concerning Fortuna Sanchez's death and Pena-Bencosme's gunshot wound. Gov't Exs. B, C. This evidence is sufficient to establish probable cause to support the homicide charge against Pena-Bencosme.

First, the autopsy and ballistics reports on the bullets recovered from Fortuna Sanchez suggest that Fortuna Sanchez was killed by a bullet fired from Pena-Bencosme's gun. Gov't Ex. B at 66, 78. The fact is confirmed by admissions made by Pena-Bencosme himself. Pena-Bencosme has submitted what appears to be a transcript of statements he made to officials in the Dominican Republic in the presence of his attorney, Mendez Sanchez. In his statement, Pena-Bencosme acknowledges firing his pistol and shooting Fortuna Sanchez, but only after Fortuna Sanchez shot him first. Def. Ex. 2 (Answers to Questions 5, 16, 20, 22).

The pathology and ballistics reports concerning Pena-Bencosme's wound lend further support to the government's case. These reports conclude that Pena-Bencosme was shot in the back of his left shoulder, but that the bullet was fired from a gun used by Rodriguez Urena, and not – contrary to Pena-Bencosme's statement – by Fortuna Sanchez. Given that Pena-Bencosme sustained only one gunshot wound, and that the shot was fired by Rodriguez Urena, it is hard to believe that Fortuna Sanchez fired his weapon at all; it seems unlikely that an experienced police officer, standing beside the driver's window of a stationary car, would have pointed and shot at the driver but missed him entirely.

The witness statements presented by the government also suggest that Fortuna Sanchez posed no immediate threat to Pena-Bencosme at the time of the shooting. Medina Santos, Rodriguez Urena, and Rumaldo Matera each state that Fortuna Sanchez identified himself as a

police officer and had his gun in one holster and his magazine in another when he approached Pena-Bencosme's car.   According to Rumaldo Matera, Fortuna Sanchez had merely asked Pena-Bencosme to stop insulting him and leave the area before Pena-Bencosme fired his weapon. Finally, Reyna Maria Rosario, Fortuna Sanchez's wife, stated that when she rushed to her husband's side after he was shot, Fortuna Sanchez was not holding his weapon.

Defendant has submitted evidence that raises serious doubts about the reliability of the government's proof.  Pena-Bencosme has obtained sworn statements from two of the government's witnesses, Medina Santos and Rodriguez Urena.  Def. Exs. 9, 10.  Both state that Fortuna Sanchez was inebriated on the night in question, that his gun was loaded when he approached Pena-Bencosme's car, and that his conduct was threatening.  Rodriguez Urena adds that he actually observed Fortuna Sanchez run towards the car with his gun cocked and fire his weapon.

Clearly, this evidence is troubling and raises substantial questions about the credibility of the government's proof and Pena-Bencosme's state of mind when he fired at Fortuna Sanchez.  I am also struck by the lack of any indication in the government's submission that Fortuna Sanchez's gun was ever examined to see whether it was fired and of any evidence – other than the statement by Fortuna Sanchez's wife, Rosario, that his gun was not in his hand when she rushed to his side – concerning where Fortuna Sanchez's gun was found.  Finally, I note that Rosario contradicts herself within her own statement.  She first claims that she was in the car when Fortuna Sanchez approached Pena-Bencosme, but later states that "they started to argue . . . and my husband fell in my arms."  Gov't Ex. C at 3-4.

As disconcerting as defendant's evidence and the omissions from the government's case

are, however, they do not overcome the government's showing of probable cause or defeat the Dominican Republic's extradition request. First, the statements made to defendant's counsel by Medina Santos and Rodriguez Urena contradict the statements they made to Dominican officials, or at least the reports of those statements prepared by the Dominican officials who took them. Because the statements submitted by defendant are merely contradictory, they are inadmissible in an extradition proceeding. *See Shapiro*, 478 F.2d at 901; *Sindona*, 450 F. Supp. at 685.

Even if the statements were admissible, they would be insufficient to defeat probable cause. First, there is little reason to believe that the witness statements presented by defendant are any more accurate than those submitted by the prosecution. Just as Pena-Bencosme asserts that the prosecutor's version of the witnesses' statements is slanted, so too, undoubtedly, are defendant's versions, procured as they were by counsel for Pena-Bencosme. *See*, *e.g.*, Def. Ex. 9, ¶ 1 ("That this affidavit is being prepared for me by the attorney for [the defendant].") and ¶ 9 ("There are many more details that I could provide, however[,] Mr. Pena's attorney has indicated these are the major areas of interest for the extradition hearing."). Moreover, the incriminating statements of Rumaldo Matera and Fortuna Sanchez's wife stand unqualified, and the ballistics evidence indicating that Pena-Bencosme was shot by Rodriguez Urena's gun remains uncontradicted.[12]

In any event, evidence that merely raises doubts about the reliability of the government's proof is insufficient to defeat an extradition request. *See*, *e.g.*, *Singh*, 170 F. Supp. 2d at 1013,

---

[12] Although Rodriguez Urena has apparently decided to cooperate with Pena-Bencosme's attorneys and provide them with an exculpatory statement, he has not challenged the ballistics report's conclusion that it was his weapon that fired the bullet removed from Pena-Bencosme's body.

*aff'd in part*, *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (finding probable cause even though defendant's evidence – affidavits from the government's witnesses stating that they never identified the defendant – cast "substantial doubt" on the reliability of the government's submissions that included an investigator's summary of witnesses' statements indicating that they did identify the defendant); *Fernandez Morris*, 99 F. Supp. 2d at 1361 ("Testimony that merely gives the opposite version of the facts does not destroy the probability of guilt."); *Freedman v. U.S.*, 437 F. Supp. 1252, 1266 (N.D. Ga. 1977) (recognizing that "the mere presentation of witnesses who testify as to an opposite version of facts will not" obliterate probable cause). Defendant's evidence merely demonstrates that the proof is conflicting: according to some witness statements, Fortuna Sanchez identified himself as a police officer, whereas according to others, he did not; according to some witness statements, only one shot was heard before Fortuna Sanchez fell to the ground, whereas according to others, Fortuna Sanchez fired first; according to some witness statements, Fortuna Sanchez's weapon was holstered, whereas according to others, it was in his hand and pointed at the defendant. These conflicts raise factual disputes that should be resolved at a trial in the Dominican Republic. *Hoxha v. Levi*, 371 F. Supp. 2d 651, 658 n.2 (E.D. Pa. 2005) ("Whether to believe all, any, or none of the witnesses who have now apparently changed their stories is simply not a matter properly decided by this Court."); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1434 (S.D. Fla. 1993) ("The contradictions in the evidence may create a reasonable doubt as to Petitioner's guilt. However, it is not the Court's role to determine whether there is sufficient evidence for a conviction.").

Finally, as discussed in detail above, self-defense is an affirmative defense, and the language of the pertinent Dominican statute suggests that Pena-Bencosme bears the burden of

establishing it at trial. Case law clearly holds that the availability of an affirmative defense is not a proper basis for denying an extradition request. *Charlton*, 229 U.S. at 462. 33 S. Ct. at 950; *Shapiro*, 478 F.2d at 901. Moreover, assuming Fortuna Sanchez approached Pena-Bencosme while pointing a loaded weapon, it is also the case that Pena-Bencosme was behind the wheel of his SUV at the time, and that he drove off after firing his weapon at Fortuna Sanchez. A fact finder who has had the benefit of hearing the testimony of all of the relevant witnesses might conclude that the most reasonable course of action would have been for Pena-Bencosme to have driven off without first firing his weapon.

For all these reasons, I conclude that there is sufficient evidence to establish probable cause to believe that Jeffry Alejandro Pena-Bencosme committed voluntary homicide when he shot Santiago Fortuna Sanchez. The proof submitted by the government is sufficient to support its extradition request.

## V.      Protection from Extradition

Pena-Bencosme also argues that the extradition request should be denied because he fears for his safety if returned to the Dominican Republic. At the hearing, he presented the testimony of Jesus del Carmen Mendez Sanchez, his lawyer in the Dominican Republic, who testified that there were threats made against Pena-Bencosme. Tr. 21-22.

When determining whether to issue a certificate of extradition, courts must follow the firmly-established "rule of non-inquiry." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990) (holding that it was improper to consider evidence in an extradition proceeding concerning the requesting authority's law enforcement procedures and its treatment of prisoners ); *Sindona v. Grant*, 619 F.2d 167, 174-75 (2d Cir. 1980); *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960);

*Sandhu v. Burke*, 2000 WL 191707, at *7 (S.D.N.Y. 2000). Under this rule, a court "is not permitted to inquire into the procedures that will be followed in the requesting country or the degree of risk that the extraditee would face after extradition." *Sandhu*, 2000 WL 191707, at *7. This is so because discretionary authority to deny extradition on humanitarian grounds rests with the Secretary of State. *Lo Duca v. U.S.*, 93 F.3d 1100, 1103-04 (2d Cir. 1996); *Ahmad*, 910 F.2d at 1067; *Sindona*, 619 F.2d at 174-75. *See also* Gov't Ex. A, Art. VIII (creating discretionary authority in the Secretary of State to decide whether or not to extradite its own citizens). Although any court would be concerned with whether an extradited defendant will receive fair and humane treatment in a foreign country, the argument raised by Pena-Bencosme about his safety is simply not a basis for this Court to deny extradition.

## Conclusion

For the reasons stated above, I find that there is probable cause to warrant a finding of extradition against Jeffry Alejandro Pena-Bencosme and that he has failed to establish any defense to extradition. The government's request for a certificate of extraditability is granted.

**SO ORDERED.**

_____/s/_____
**STEVEN M. GOLD**
**United States Magistrate Judge**

**Brooklyn, New York**
**November 13, 2006**

*U:\eoc 2004-2006\pena-bencosme\extradition order - final.wpd*