**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
UNITED STATES OF AMERICA

                v.                                        MEMORANDUM
                                                              AND ORDER
JEFFRY ALEJANDRO PENA-BENCOSME,           05-M-1518 (SMG)

       Defendant.
-------------------------------------------------------X
**Gold, S., U.S.M.J.:**

## INTRODUCTION

       By Memorandum & Order dated November 13, 2006 ("M&O"), Docket Entry 21, I granted the government's request for a certificate of extradition for Jeffry Alejandro Pena-Bencosme ("Pena-Bencosme" or "defendant"). Pena-Bencosme is charged in the Dominican Republic with voluntary homicide in relation to the shooting death of Santiago Fortuna Sanchez ("Fortuna Sanchez"), a Dominican police officer. Familiarity with my prior Memorandum and Order is presumed.

       I granted Pena-Bencosme a stay of extradition on the condition that he file a petition for a writ of habeas corpus no later than December 15, 2006, which he did. During the course of the related habeas proceedings, *In re Jeffry Alejandro Pena Bencosme*, 06-CV-6745, the Honorable Nicholas G. Garaufis, the United States District Judge presiding over the habeas petition, allowed Pena-Bencosme to move to reopen the extradition proceeding before me.

       In his letter application to reopen and for reconsideration, Pena-Bencosme asks me to consider "additional evidence bearing on the issue [of] whether the Dominican Republic deliberately tailored their submissions, particularly witness statements, to deceive and mislead the Court into falsely believing that the shooting of Santiago Fortuna Sanchez . . . was unprovoked and without justification." Pena-Bencosme Letter dated May 31, 2007 ("Reopen

Letter") 1, Docket Entry 27. My finding of probable cause to support extradition relied heavily on the statements attributed by the Dominican prosecutor to three eyewitnesses to the shooting of Fortuna Sanchez. Pena-Bencosme now contends that these three witnesses did not make the incriminating statements the prosecutor says they did, and has submitted affidavits from each of them in support of his argument.

If in fact each of the government's eyewitnesses, other than the victim's wife, unequivocally denied having made the incriminating statements attributed to them by the Dominican government, I would have serious doubts about the reliability of the Dominican Republic's submissions in support of extradition and might vacate my finding of probable cause. *See In re Extradition of Ben-Tov*, No. 05-22201 at 18 (S.D. Fla. Feb. 22, 2006) (vacating the original certification for extradition after finding that there could be "no confidence in the reliability of the [foreign government's] submissions" based on defendant's new documentary evidence and affidavits). Accordingly, based on Pena-Bencosme's proffer and the affidavits he submitted, I granted his request to reopen the extradition proceedings.

On October 10, 2007, I held a hearing at which Pena-Bencosme presented the live testimony of two of the four witnesses relied on by the Dominican Republic in support of its showing of probable cause.[1] Contrary to Pena-Bencosme's assertions, the hearing revealed no basis to conclude that the Dominican prosecutor misrepresented the statements made by the

---

[1] The hearing was repeatedly adjourned in the hopes that arrangements could be made for the witnesses to travel to New York to testify. Ultimately, the hearing was conducted via videoconference with the witnesses testifying in the Dominican Republic. The Dominican prosecutor was also present. Due to technical difficulties, however, the Court only had audio of the witnesses, although the witnesses had audio and video of the proceedings held here in the United States.

witnesses to the shooting or otherwise misled this Court. Rather, as set forth in detail below, the Dominican Republic's submission in support of extradition was based on virtually verbatim recitations of the signed statements made by the witnesses to police investigators, and there is no evidence that those statements were coerced. Accordingly, and for the reasons discussed below, I do not find that the Dominican prosecutor deceived this Court or that probable cause has been "obliterated," and I accordingly decline to reconsider my decision certifying extradition. I also address below Pena-Bencosme's alternative argument that his extradition would violate the principle of dual criminality. Pena-Bencosme Letter dated Aug. 22, 2007, Docket Entry 37.

## DISCUSSION

*A.     Statements by the Eyewitnesses*

The Dominican Republic's extradition request was supported by the statements of four eyewitnesses: 1) Desiderio de Jesus Medina Santos, the owner of the bar where the shooting occurred, 2) Julio Rodriguez Urena, an off-duty police officer who was working security at the bar and who is alleged to have shot Pena-Bencosme while he was fleeing, 3) Josue Rumaldo Matera, a security guard at the bar, and 4) Reyna Maria Rosario, the victim's wife. These statements are set forth in detail in the M&O at 10-11. In short, the Dominican prosecutor represented that each of these witnesses made statements indicating that Pena-Bencosme was *not* acting in self-defense when he shot Fortuna Sanchez. Moreover, all of them, except for the victim's wife, noted that they observed Fortuna Sanchez remove the clip from his gun and put the clip in one holster and the gun in another before approaching Pena-Bencosme. These witnesses' statements were corroborated to some extent by ballistics evidence.

As noted above, Pena-Bencosme has submitted affidavits from Medina Santos, Rodriguez

Urena, and Matera,[2] three of the four eyewitnesses. In these affidavits, discussed in greater detail below, one witness stated that there are inaccuracies in the Dominican prosecutor's summary of his statement and two provided accounts of the events very different from the ones attributed to them in the Dominican Republic's submission. Finally, at the hearing on defendant's motion to reopen, Matera and Rodriguez Urena testified about their statements to Dominican officials and the affidavits they signed at the request of Pena-Bencosme's attorneys. They also testified about what they observed on the night of the shooting. There are now three versions of what happened on October 24, 2004 by two of the witnesses and two versions by one witness. Each of the witnesses' statements is summarized below.

    1.    *Desiderio de Jesus Medina Santos*

According to the Dominican Republic's submission in support of extradition (hereinafter, "prosecution statement"), Medina Santos observed Pena-Bencosme shoot Fortuna Sanchez, "who could not have fired because his weapon was in one holster and the magazine was in another."[3] Then, in an affidavit submitted by Pena-Bencosme after the extradition hearing held in 2006 (hereinafter, "defense affidavit"),[4] Medina Santos stated "I have reviewed the summary of my

---

[2] In the Dominican Republic's original submission, this witness is referred to as Matera. In his defense affidavit and hearing testimony, however, the witness identified himself as Natera. For the sake of clarity, I use the spelling Matera to refer to the witness.

[3] The witnesses' "prosecution statements" were entered into evidence by the government at the extradition hearing held on September 14, 2006. *See* Documents Submitted on Behalf of the Dominican Republic ("Gov't Documents") Exhibit C. These documents, as well as many of the other exhibits referenced in this memorandum, are not available on the court's electronic case filing ("ECF") system.

[4] Medina Santos' defense affidavit was submitted by Pena-Bencosme as Exhibit 9 to his letter of September 29, 2006.

4

statement as submitted to the United States Government by the Dominican authorities. There are a number of omissions and distortions that might mislead the reader." Medina Santos claimed in this affidavit that he told the Dominican authorities that Fortuna Sanchez was intoxicated at the time of the shooting and that Fortuna Sanchez "racked" his gun, i.e., placed a bullet in its chamber, before running over to Pena-Bencosme. In addition, he disavowed hearing Pena-Bencosme insult Fortuna Sanchez, which contradicts his prosecution statement. Medina Santos concluded by stating that, although he revealed these details to the Dominican authorities, they were not included in his prosecution statement.

2.  *Julio Rodriguez Urena*

According to the prosecution statement, Rodriguez Urena told the Dominican authorities that "when [Fortuna Sanchez] approached the vehicle [of Pena-Bencosme,] his pistol was in one holster and the magazine in another. At that moment Jeffry Alejandro Pena Bencosme took out his pistol and fired the shot that caused the death of Santiago Fortuna Sanchez." Rodriguez Urena also stated that Fortuna Sanchez identified himself as a police officer during the confrontation. Moreover, according to the prosecution statement, Rodriguez Urena admitted that he fired the shot that caused Pena-Bencosme's gunshot wound.

In his post-hearing affidavit (hereinafter, "defense affidavit"), Rodriguez Urena stated that Fortuna Sanchez was intoxicated at the time of the shooting.[5] According to the affidavit, Rodriguez Urena saw Fortuna Sanchez "r[u]n towards the window of the [defendant's] vehicle with the cocked gun (in other words racked) . . . Fortuna Sanchez approached the door . . .,

---

[5] Rodriguez Urena's defense affidavit was submitted by Pena-Bencosme as Exhibit 10 to his letter dated September 29, 2006.

5

various shots were heard, and [Rodriguez Urena] was able to observe when the Sergeant Fortuna Sanchez fired his weapon." Although Rodriguez Urena acknowledged in the affidavit that he fired his weapon, he does not say whether he was the one responsible for Pena-Bencosme's wound.

Finally, Rodriguez Urena testified at the hearing held on October 10, 2007. Rodriguez Urena testified that Fortuna Sanchez reprimanded Pena-Bencosme for urinating in the street, but never identified himself as a police officer. Tr. 58.[6] Rodriguez Urena saw Fortuna Sanchez take out his gun, put a bullet in the chamber, and remove the clip. Tr. 59-60. Fortuna Sanchez then approached Pena-Bencosme's vehicle and may have punched him. Tr. 59. Rodriguez Urena could not see whether Fortuna Sanchez had his gun in his hand at that time or not. Tr. 61, 71. Rodriguez Urena testified that he then heard several shots, but that he does not know who fired any of them. Tr. 63. Moreover, he explicitly disavowed that portion of his police statement in which he stated that he fired the shot that caused Pena-Bencosme's wound. Tr. 75, 78-79.

    3.    *Josue Rumaldo Matera*

In the prosecution statement, Matera is similarly reported to have seen Fortuna Sanchez remove the magazine from his gun, secure the gun in his pocket, and approach Pena-Bencosme to ask him to leave. Matera then saw Pena-Bencosme shoot Fortuna Sanchez. In his defense affidavit, though, Matera asserted that Fortuna Sanchez was drunk on the night in question, approached Pena-Bencosme with his gun in his hand and, without identifying himself as a police

---

[6] "Tr." refers to the Transcript of the Hearing held on October 10, 2007.

6

officer, fired the first shot.[7] Finally, at the hearing, Matera testified that Fortuna Sanchez "dared" Pena-Bencosme to fight, and that he saw Fortuna Sanchez slap Pena-Bencosme and then heard "a few" shots, but that he did not see who fired them. Tr. 26, 30-31. Matera specifically denied having seen Fortuna Sanchez fire first. Tr. 38.

B.  *Pena-Bencosme's Allegations of Fraud by the Dominican Republic*

In the earlier extradition proceedings before me, Pena-Bencosme argued that the Dominican government had "tailore[ed]" the witnesses' statements by deliberately misstating and omitting certain material facts. Def. Supp. Mem. 3-5, Docket Entry 19. As discussed above and noted in my M&O, Pena-Bencosme had obtained post-hearing affidavits from Medina Santos and Rodriguez Urena in which each provided a different and far more exculpatory version of events than the one attributed to him in the Dominican prosecutor's submission. M&O 14-15. I found that defendant's evidence was "troubling and raise[d] substantial questions about the credibility of the government's proof and Pena-Bencosme's state of mind when he fired at Fortuna Sanchez." *Id*. at 19. Nonetheless, I concluded that Pena-Bencosme failed to overcome the government's showing of probable cause, reasoning, in part, that the contradictory defense affidavits of Medina Santos and Rodriguez Urena were not admissible in an extradition proceeding. *Id*. at 20; *see Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) (approving an extradition judge's exclusion of evidence that suggested that "statements alleged to have been made by Shapiro had not in fact been made" because, even if admitted, the evidence "would only pose a conflict of credibility"); *Sindona v. Grant*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978)

---

[7] Matera's defense affidavit was submitted by Pena-Bencosme attached to his letter dated July 31, 2007.

7

(holding that an accused may not offer contradictory evidence or evidence attacking credibility at an extradition hearing). I further noted that the incriminating statements of the other two eyewitnesses stood unqualified, and that the ballistics evidence indicating that Pena-Bencosme was shot by Rodriguez Urena's gun remained uncontradicted. M&O 20. Accordingly, I ultimately concluded that the conflict between the affidavits submitted by Pena-Bencosme and the statements relied on by the Dominican prosecutor raised factual disputes that should be resolved at a trial in the Dominican Republic. *Id*. at 21.

In support of his motion to reopen, Pena-Bencosme argues that he has developed additional evidence suggesting that the Dominican government is misleading this Court about the exculpatory and mitigating circumstances surrounding Pena-Bencosme's shooting of Fortuna Sanchez. Pena-Bencosme offers three types of evidence in support of his argument: 1) further evidence that the witnesses' statements provided to this Court by the Dominican authorities were "tailored," 2) evidence that the Dominican Republic omitted statements from Pena-Bencosme's friends, who all suggest that Pena-Bencosme acted in self-defense, from its extradition submission, and 3) evidence possibly suggesting that the Dominican prosecutor attempted to bribe a witness. Having heard and reviewed all of defendant's additional evidence, I am not persuaded that I should vacate my prior Order certifying extradition.

First, Pena-Bencosme has failed to demonstrate that the Dominican prosecutor deliberately attempted to mislead this Court, or even that the witnesses relied on in support of extradition have unequivocally recanted their incriminating statements. To the contrary, it is clear that the Dominican prosecutor accurately summarized the witnesses' police interviews in her submission. Although there is some doubt as to whether the Dominican police accurately

recorded the witnesses' statements, there is no suggestion that the Dominican prosecutor had any reason to doubt the accuracy of the signed interviews.

In its opposition to Pena-Bencosme's application to reopen his extradition hearing, the government submitted, for the first time, signed copies of the statements that Medina Santos, Rodriguez Urena, and Matera made to the Dominican authorities (hereinafter, "police interviews"). Gov't Letter dated Aug. 9, 2007 ("Gov't Letter") Exs. A-C. At the end of each statement, directly above each signature, it reads, in substance: "With this last question we have terminated the present questioning which was orally read to the declarant, manifesting his agreement and upon this, signing it . . . ." Gov't Letter Ex. A.[8] When the prosecution statements submitted by the Dominican government in support of extradition are compared with these police interviews, it becomes clear that the Dominican prosecutor extracted the statements she presented to this Court almost verbatim from the signed police interviews, and that she did not omit any exculpatory information from them. *Compare* Gov't Letter Exs. A-C *with* Gov't Documents Ex. C. Thus, no fraud or effort to mislead the Court has been established.

Moreover, the evidence presented at the hearing leaves the degree to which the witnesses have recanted their incriminating testimony, and the reliability of their recantations, in doubt. The Court has now been presented with Medina Santos' incriminating prosecution statement and exculpatory defense affidavit and Matera's and Rodriguez Urena's incriminating prosecution statements, exculpatory defense affidavits, and equivocal hearing testimony.[9] If these witnesses

---

[8] The exact translation in each of the witnesses' statements varies slightly in its precise wording but not in its substance or meaning. *See* Gov't Letter Exs. A, B, C.

[9] As noted above, Medina Santos did not testify at the hearing.

had denied signing their police interviews and stood by their defense affidavits at the hearing, Pena-Bencosme's contention that probable cause had been obliterated might be compelling. However, at the hearing, both Matera and Rodriguez Urena acknowledged that they signed their police interviews. Tr. 38-39, 64. Although both contended that their police interviews were not accurate, tr. 47-48, 73-75, and that they signed their interviews without reading them first, tr. 39, 64-66, neither claimed to have been forced into making any particular incriminating statement or signing the police interview, and Rodriguez Urena affirmatively disclaimed any police coercion, tr. 75-76. Moreover, both Matera and Rodriguez Urena also testified that their defense affidavits were not accurate, and each claimed to have signed his affidavit without reading it first. Tr. 35-38, 67-69. In short, the evidence now consists of multiple versions of the same events, and there is no compelling reason to believe that any one of those versions is more or less reliable than any other. Under these circumstances, this case continues to pose factual disputes appropriately resolved at a trial in the Dominican Republic. *See* M&O 21 and cases cited therein.

Courts are divided over whether recantation evidence is even properly received in an extradition proceeding. *See In re Extradition of Singh*, 170 F. Supp. 2d 982, 1016-19 (E.D. Cal. 2001) (discussing the split in authority on the admissibility of recantation evidence in extradition proceedings). Where a recantation is received, it is only because it bears strong indicia of reliability, such as a recantation made during the course of a court proceeding or made against the interests of the individual recanting, and obliterates probable cause. *See In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1126 (E.D. Cal. 2003) (admitting a recantation made at a videotaped hearing that obliterated a weak probable cause showing); *Sandhu v. Burke*, 2000 WL 191707, at *15-16 (S.D.N.Y. Feb. 10, 2000) (acknowledging that courts have considered

recantation evidence which tends to obliterate probable cause); *Maguna-Celaya v. Haro*, 19 F. Supp. 2d 1337, 1343-44 (S.D. Fla. 1998) (holding that recantations would be considered because they were reliable and negated probable cause); *In re Extradition of Contreras*, 800 F. Supp. 1462, 1468-69 (S.D. Tex. 1992) (finding that recantations by all eleven co-defendants during a court proceeding were sufficiently reliable to obliterate probable cause); *Republic of France v. Moghadam*, 617 F. Supp. 777, 783 (N.D. Cal. 1985) (admitting recantation made against declarant's interest as more reliable than original statements). In *Strunk*, the court noted that "[w]here the *only* evidence to support probable cause is the unrecanted confession, courts have admitted the recantation as obliterating probable cause." 293 F. Supp. 2d at 1126 (emphasis added).

Courts, however, have been reluctant to consider recantation evidence where, as here, "the credibility of [the witness'] recantation cannot be determined without a trial." *Singh*, 170 F. Supp. 2d at 1025, *aff'd in part sub nom. Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005). *See also In re Kuri*, 2006 WL 1663536, at *4 (D. Ariz. June 4, 2006) (admitting recantation evidence but certifying extradition after concluding that the recantations failed to obliterate probable cause); *Hoxha v. Levi*, 371 F. Supp. 2d 651, 658 n.2 (E.D. Pa. 2005) (finding that "the recantations raise credibility issues best left to the Albanian judicial system"), *aff'd*, 465 F.3d 554 (3d Cir. 2006); *Orellana v. Parks*, 2003 WL 1960268, at *7 (S.D.N.Y. Mar. 25, 2003) (giving no weight to a recantation as it was outside the scope of admissible evidence in an extradition proceeding); *Abu Eain v. Adams*, 529 F. Supp. 685, 691 (N.D. Ill. 1980) (refusing to admit recantation evidence), *aff'd sub nom. Eain v. Wilkes*, 641 F.2d 504 (7th Cir. 1981).

In *Singh*, the defendant, Barapind, presented affidavits from some of the eyewitnesses

11

recanting their earlier incriminating statements to the foreign government's authorities. 170 F. Supp. 2d at 1016. The extradition court noted that "the only evidence linking Barapind to the crimes charged is eye-witness statements, which if totally and truthfully recanted by those eye-witnesses under reliable circumstances would obliterate probable cause." *Id*. at 1017. After considering all of Barapind's evidence, the court concluded that "[a]lthough substantial doubt is created by the contradictory affidavits of [the eyewitnesses], the competence of [the foreign government's] evidence requires a trial to resolve the existing material credibility disputes" with respect to some of the charges. *Id*. at 1025. *But see id*. at 1020-21 (finding that a recantation of an identification and then a subsequent re-identification created an unreliable record and finding a lack of probable cause to extradite on that charge). The Ninth Circuit affirmed the extradition court's finding of probable cause, recognizing that a witness' affidavit denying having made incriminating statements attributed to him by the police "constituted conflicting evidence, the credibility of which could not be assessed without a trial. . . . [E]xtradition courts 'do[] not weigh conflicting evidence' in making their probable cause determinations." *Barapind*, 400 F.3d at 750 (citation omitted). As in *Barapind*, Pena-Bencosme's conflicting evidence may raise questions about the reliability of the evidence against him, but it does not "obliterate" probable cause or eliminate the need for a trial.

Pena-Bencosme raises two additional arguments in support of his contention that the Dominican prosecutor has misled this Court. First, Pena-Bencosme asserts that the Dominican prosecutor failed to include exculpatory evidence from additional witnesses in her submission to this Court in support of extradition. At the hearing, defendant called Mery Julia Mateo and Tulia Franchesca Perez Polanco, two of Pena-Bencosme's friends who were with Pena-Bencosme on

12

the night of the shooting. These witnesses had been interviewed by the police, and their statements, as documented by the Dominican authorities, accurately summarized the exculpatory details they communicated when the police interviewed them. *Compare* Pena-Bencosme Letter dated Sept. 29, 2006 Ex. 1 *with* Exs. 11, 12. *See also* Tr. 99-100. Although Pena-Bencosme accurately points out that this exculpatory evidence was not included in the Dominican Republic's extradition submission, that fact lends no support to his position. A country requesting extradition is not obligated to disclose exculpatory, or *Brady*, material in an extradition request. *See Sacirbey v. Guccione*, 2006 WL 2585561, at *14 (S.D.N.Y. Sept. 7, 2006); *Montemayor v. U.S.*, 329 F. Supp. 2d 883, 888 (S.D. Tex. 2004); *In re Extradition of Koskotas,* 127 F.R.D. 13, 27 (D. Mass. 1989) ("Courts have expressly held that *Brady* principles do not pertain to extradition hearings because no determination of guilt or innocence is being made."); *In re Extradition of Singh*, 123 F.R.D. 108, 112 (D.N.J. 1987) (holding that "*Brady* is inapplicable" in extradition proceedings). Thus, the Dominican Republic's failure to include in its submission the statements made by Mateo and Perez Polanco – or any other exculpatory evidence – is not a basis for denying extradition.

Second, Pena-Bencosme contends that there is evidence suggesting that the Dominican prosecutor may have bribed a witness to influence his testimony. However, the evidence of "bribery" presented by Pena-Bencosme fails to establish any misconduct by the Dominican prosecutor, let alone an attempt to bribe a witness. Pena-Bencosme alleges that the prosecutor requested that an eyewitness, Medina Santos, "maintain the same story he had provided to law enforcement in return for assistance in a civil suit for damages" against Pena-Bencosme once he is returned. Reopen Letter 2. In support of his argument, the defendant offers an affidavit from

Jose Oscar Marte, Medina Santos' Dominican civil attorney, who was present at the time the alleged bribe was offered. Marte states that the Dominican prosecutor requested Medina Santos to "uphold his sworn statement" and in exchange the prosecutor would "help [Medina Santos] in exercising the civil action against" Pena-Bencosme. *Id.* Ex. 1. Even assuming this occurred, it would not constitute evidence of bribery or tampering with a witness. Prosecutors in the United States often offer various benefits to individuals in exchange for their truthful testimony. Moreover, there is no basis to conclude that the prosecutor believed the testimony she was asking Medina Santos to provide was not truthful. I therefore decline to draw any inference of prosecutorial misconduct based on the Marte affidavit.

In conclusion, rather than demonstrating fraud by the Dominican Republic or obliterating probable cause, the evidence presented by Pena-Bencosme has only created more confusion about what happened the night Fortuna Sanchez was shot. There is no doubt that Pena-Bencosme was present and, based on his own statements and even those of his friends, that Pena-Bencosme shot Fortuna Sanchez. There is, however, conflicting evidence concerning who fired the first shot, who saw the shots being fired, whether Fortuna Sanchez ever fired his weapon, and ultimately whether Pena-Bencosme's actions were justified in self-defense. These factual questions should be decided after a full trial in the requesting country. *See Hoxha v. Levi*, 371 F. Supp. 2d 651, 658 n.2 (E.D. Pa. 2005) ("Whether to believe all, any, or none of the witnesses who have now apparently changed their stories is simply not a matter properly decided by this Court."); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1434 (S.D. Fla. 1993) ("The contradictions in the evidence may create a reasonable doubt as to Petitioner's guilt. However, it is not the Court's role to determine whether there is sufficient evidence for a conviction.").

14

Accordingly, I decline to reconsider my prior M&O certifying extradition.

C.     *Dual Criminality*

During the course of these recent proceedings, Pena-Bencosme has raised the issue of whether the general extradition requirement of dual criminality has been met. Pena-Bencosme Letter dated Aug. 22, 2007, Docket Entry 37. Under the laws of the state of New York and the United States, self-defense renders otherwise criminal conduct lawful. *Id*. It appears that in the Dominican Republic, however, self-defense is treated only as a mitigating factor for sentencing purposes. M&O 9. Moreover, under United States federal law, the absence of self-defense is an element of a homicide charge that must be established beyond a reasonable doubt by the prosecutor. *See U.S. v. Quintero*, 21 F.3d 885, 890 (9th Cir. 1994) ("To convict a defendant charged with murder of voluntary manslaughter, the government must prove that (1) the defendant intentionally inflicted an injury upon another from which the other died; and (2) the homicide was committed without justification or excuse."). This court's reading of the Dominican Republic's relevant criminal statutes, however, suggests that they provide that self-defense is an affirmative defense that must be proven by the defendant. M&O 9.

"The general principle of international law is that in all cases of extradition the act done on account of which extradition is demanded must be considered a crime by both parties. . . ." *Wright v. Henkel*, 190 U.S. 40, 58, 23 S. Ct. 781, 785 (1903). This policy has become known as the principle of dual criminality, and a majority of modern treaties explicitly incorporate this principle. *See, e.g.,* Extradition Treaty art. II, sec. 1, U.S.-Peru, July 26, 2001, S. Treaty Doc. No. 107-6 ("An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a

15

more severe penalty."); Extradition Treaty art. 2, U.S.-South Africa, Sept. 16, 1999, S. Treaty Doc. No. 106-24 (same); Extradition Treaty art. 2, U.S.-Italy, Sept. 24, 1984, 35 U.S.T. 3023 (same); Extradition Treaty art. 2, U.S.-Costa Rica, Dec. 4, 1982, S. Treaty Doc. No. 98-17 (same); Extradition Treaty art. II, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 (same). The Extradition Treaty between the United States and the Dominican Republic (hereinafter, the "Treaty"), however, has no such provision. Extradition Treaty art. II, U.S.-Dominican Republic, June 19, 1909, 36 Stat. 2468. Thus, the question arises in the present case whether the general principle of dual criminality applies absent a specific provision in the treaty requiring it.

In *Factor v. Laubenheimer*, 290 U.S. 276, 54 S. Ct. 191 (1933), the Supreme Court specifically addressed this question with respect to an extradition treaty then in force between the United States and Great Britain. The Court held that the customary requirement of dual criminality need not be met if the relevant treaty does not specifically require it. *Id*. at 293-94, 54 S. Ct. at 196 (reasoning that, "if a treaty fairly admits of two constructions, one restricting the right which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred").

The Treaty here has dual criminality provisions nearly identical to those at issue in *Factor*. For example, in *Factor*, the Court noted that the treaty provided that extradition for certain specified crimes required that the offenses be criminal and punishable in both countries, but that the treaty provision with respect to the crime at issue did not have such a prerequisite. *Id*. at 292-93, 54 S. Ct. at 195. Here, the Treaty specifically requires dual criminality with respect to the crimes of embezzlement, suppression of slavery and slave trading, and for participation in any of the enumerated crimes as an accessory. *See* Treaty art. II (15)

16

("Embezzlement . . . when the crime or offence is punishable by imprisonment . . . by the laws of both countries), (21) ("Crimes and offences against the laws of both countries for the suppression of slavery and slave trading.") (22) ("The extradition is also to take place for participation in any of the aforesaid crimes as an accessory . . ., provided such participation be punishable by imprisonment by the laws of both Contracting Parties."). There is no dual criminality provision, however, for charges of homicide. *See id*. art. II (1). Interpreting the Treaty as the Supreme Court interpreted the comparable treaty in *Factor* leads to the conclusion that dual criminality is not a prerequisite for extradition on a charge of voluntary homicide in defendant's case.

Moreover, even if dual criminality was required here, Pena-Bencosme would still be subject to extradition. Pena-Bencosme's dual criminality argument would be persuasive only if he established that he acted in self-defense. As discussed above and in the M&O, however, there is probable cause to believe that Pena-Bencosme shot Fortuna Sanchez without justification. While the evidence on this issue may now be confused and inconsistent, this merely raises credibility questions for trial. Accordingly, Pena-Bencosme has failed to establish that his extradition would violate the principle of dual criminality.

## CONCLUSION

For all these reasons, Pena-Bencosme's motion for reconsideration of my Order granting the government's application for a certificate of extraditability is denied. Pena-Bencosme's extradition shall be stayed until a decision is rendered on his pending habeas petition.

**SO ORDERED.**

/s/
**Steven M. Gold
United States Magistrate Judge**

**Brooklyn, New York
October 30, 2007**